## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **ENTERGY NEW ORLEANS, LLC** | * | **CIVIL ACTION NO.** |
| | * | |
| | * | **SECTION:** |
| **VERSUS** | * | |
| | * | **JUDGE:** |
| | * | |
| **THE HAWTHORN GROUP, L.C.** | * | **MAG. DIV.:** |
| | * | |
| | * | **MAG. JUDGE:** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT

The plaintiff, Entergy New Orleans, LLC, asserts the following:

## PARTIES

### 1.

Plaintiff, Entergy New Orleans, LLC ("Entergy"), is a Texas limited liability company whose members are:

a.   Entergy Corporation, which is a Delaware corporation with its principal place of business in Louisiana;

b.   Entergy Utility Affiliates Holdings, LLC, which is a Texas limited liability company, whose members are owned by Entergy Corporation;

c.   Entergy Utility Assets Holdings, LLC, which is a Texas limited liability company, whose members are owned by Entergy Corporation;

d.   Entergy Utility Affiliates, LLC, which is a Texas limited liability company, whose members are owned by Entergy Corporation and Entergy Utility Affiliates Holdings, LLC;

e.      Entergy Utility Assets, LLC, which is a Texas limited liability company, whose members are Entergy Corporation and Entergy Utility Assets Holdings, LLC;

f.      Entergy Utility Group, Inc., which is a Texas corporation with its principal place of business in Louisiana; and

g.      Entergy Utility Holding Company, LLC, which is a Texas limited liability company, whose members are owned by Entergy Corporation; Entergy Utility Affiliates Holdings, LLC; Entergy Utility Assets Holdings, LLC; Entergy Utility Assets, LLC; Entergy Utility Affiliates, LLC; and Entergy Utility Group, Inc.

**2.**

Defendant, The Hawthorn Group, L.C. ("Hawthorn"), is a limited liability company, whose members, upon information and belief, are citizens of Virginia.

## JURISDICTION AND VENUE

**3.**

This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332, diversity of citizenship, in that the amount in controversy exceeds $75,000, exclusive of interest and costs, and the case is between citizens of different states.

**4.**

This claim arises from a contract pursuant to which Hawthorn agreed to provide certain services to Entergy in this state and judicial district. Hawthorn directed its services to the State of Louisiana, transacted business here, and engaged in frequent communication with individuals here about its engagement. Therefore, Hawthorn is subject to specific personal jurisdiction in Louisiana.

**5.**

Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. § 1391(b)(2) in that the events and omissions giving rise to the claim occurred in this district.

## BACKGROUND

**6.**

For more than 50 years, the Michoud Generating Station in New Orleans East served as the "cornerstone" of Entergy's electric system, providing 781 megawatts ("MW") of local generating capacity.

**7.**

Entergy's high-voltage transmission system was designed and evolved around the Michoud units. Because of their ages and related maintenance and operational issues (including concerns for worker safety), Entergy deactivated the Michoud units in June 2016, leaving New Orleans with no local electric generating resource within the City.

**8.**

This situation "deeply concerned" the City Council, which concern was well founded. Since the deactivation of Michoud, Entergy has faced a "serious reliability risk" and significant planning and operational challenges, including the risk of widespread, cascading outages and insufficient support following a major storm.

**9.**

In order to address these issues, on June 20, 2016, Entergy filed its Application for Approval to Construct New Orleans Power Station ("NOPS") and Request for Cost Recovery and Timely Relief ("Application").

**10.**

In the Application, Entergy requested approval of a 226 MW combustion turbine at the Michoud Site. Entergy later supplemented its Application to request approval of either the originally proposed CT Alternative with an output of 226 MW, or, alternatively, seven Wärtsilä 18V50SG Reciprocating Internal Combustion Engine Generation sets, with a total capacity of 128 MW.

**11.**

NOPS is necessary to mitigate serious reliability concerns, namely the potential for widespread, cascading outages that could cripple the entire City. Because of its location (*i.e.*, it is surrounded by water on three sides), the City of New Orleans is entirely dependent on the set of existing transmission lines situated in a relatively small geographical area, meaning that the loss of even a portion of the transmission facilities delivering energy into the City would likely prevent Entergy from serving its entire load.

**12.**

Without NOPS, Entergy is vulnerable to events that could lead to uncontrollable cascading outages in the New Orleans area and the inability to utilize a local resource to respond to storms.

**13.**

The City Council's advisors agreed with Entergy's analysis showing that a reliability need exists and that NOPS is the only viable option to provide grid stability considering the substantial risks associated with all other options.

**14.**

In connection with the NOPS project, the City Council called for public meetings in each Council district and an additional meeting "for the purpose of receiving additional public comment related to the project," which was scheduled for October 16, 2017.

**15.**

Polling conducted by BDCP, LLC revealed that 78% of the people living in New Orleans East supported the NOPS project. A similar percentage of people living throughout New Orleans also supported the project.

## CLAIM FOR BREACH OF CONTRACT

**16.**

In the fall of 2017, Entergy contacted Hawthorn, an international public affairs company that specializes in community outreach, to ascertain whether Hawthorn could supplement Entergy's internal public outreach efforts in connection with the NOPS project.

**17.**

Entergy explained to Hawthorn that it already had an organization in place to support Entergy's internal public affairs group conducting community outreach, and that Entergy was hoping to identify and engage a broader group of supporters in the process.

**18.**

Hawthorn represented to Entergy that it had a community outreach organizer "on the ground in the New Orleans area who can work on this for us and we are confident we can turn out NOLA citizens (18 and older) who support the issue (and will tell people why if asked)." Hawthorn further represented that "[t]he people we would turn out would care about

jobs/economic development, reliable and affordable power AND would be highly focused on preventing the kinds of issues the city just went through."

**19.**

In connection with the October 16, 2017 public meeting, Entergy entered into a contract with Hawthorn pursuant to which Hawthorn agreed to identify and recruit legitimate NOPS supporters to appear at the public meeting, some of whom would speak in support of the project ("the Agreement").

**20.**

Hawthorn represented and warranted in Section 22.1 of the Agreement that "it has the Competence to perform the Work," meaning "the expertise, experience, capability and specialized knowledge to perform Work in a good and workmanlike manner and within all accepted standards for the industry."

**21.**

Hawthorn further represented and warranted in Section 22.3 of the Agreement that "it will perform the Work provided for in this Contract in conformance with the highest standards of care and practice appropriate to the nature of the Work and exercise the highest degree of thoroughness, competence and care that is customary in the utility industry."

**22.**

The Agreement did not contemplate or authorize Hawthorn's paying any NOPS supporters to attend the October 16, 2017 public meeting. Based on the Agreement and Hawthorn's international reputation, Entergy expected that Hawthorn would identify people who

legitimately supported the NOPS project and encourage them to attend the meeting in support of the project.

**23.**

The Agreement also stated in Section 27 that the "Work shall be performed solely by Contractor or by those Subcontractors that Company may from time to time allow by its prior written approval." Section 27 further provided that "Contractor shall be responsible to Company for Work performed by all of its Subcontractors to the same extent it is for activities performed by Contractor's employees."

**24.**

Section 27 of the Agreement was specifically included to ensure that the services for which Entergy contracted would be provided by Hawthorn and its employees, and in the manner expected, based on the experience and reputation of Hawthorn, and not by an unapproved subcontractor.

**25.**

Hawthorn recruited individuals who appeared in support of the NOPS project to attend the October 16, 2017 public meeting.

**26.**

Entergy did not draft, review, or revise any talking points or "scripts" used by the individuals Hawthorn recruited to appear at the October 16, 2017 public meeting or at any subsequent meeting.

**27.**

On October 23, 2017, Entergy was alerted to a tweet claiming that Entergy had paid

supporters to appear at the October 16 public meeting. Entergy immediately forwarded the tweet to Hawthorn.

### 28.

Later that same day, Entergy was alerted to a second tweet containing similar information. Entergy also forwarded that tweet to Hawthorn.

### 29.

The author of the two tweets did not provide any evidence supporting his assertion that people had been paid to support the NOPS project at the October 16 public meeting.

### 30.

Following the second tweet, Entergy contacted Hawthorn and questioned its President and Chief Operating Officer as to whether Hawthorn had paid NOPS supporters to appear at the October 16, 2017 public meeting. Hawthorn assured Entergy that it had not paid anyone to appear at the public meeting.

### 31.

In connection with the February 21, 2018 Utility, Cable, Telecommunications and Technology Committee meeting ("Utility Committee Meeting"), Entergy signed Change Order No. 1 to the Agreement pursuant to which Hawthorn again agreed to recruit legitimate NOPS supporters to appear at the meeting.

**32.**

If Entergy had known that Hawthorn paid people to appear in support of the NOPS project at the October 16, 2017 public meeting, or that Hawthorn had subcontracted the work in violation of Section 27 of the Agreement, then Entergy would have immediately terminated the Agreement and taken steps to rectify the situation.

**33.**

During the February 21, 2018 Utility Committee Meeting, a man wearing a marked-up, orange Entergy t-shirt told the City Council that his friend had been paid to appear in support of the NOPS project at the October 16, 2017 public meeting.

**34.**

Hawthorn had recommended that Entergy purchase orange t-shirts for supporters to wear to the October 16, 2017 public meeting to differentiate them from NOPS opponents. Hawthorn purchased the t-shirts, instructed the t-shirt company to send some to Entergy to distribute to people that Entergy had asked to attend the October 16 public meeting, and retained the remainder for its own use.

**35.**

On February 22, 2018, Entergy emailed Hawthorn that several supporters had worn Entergy's orange t-shirt to the hearing, despite Entergy's understanding that the orange t-shirts were to be worn only at the October 16, 2017 public hearing, and that a NOPS opponent "wore a marked-up orange shirt and commented about paid supporters."

**36.**

Hawthorn dismissed the payment allegation and told Entergy that the supporters recruited

by Hawthorn who wore the orange t-shirts to the February 21 Utility Committee Meeting did so because they "were passionate about the cause" and "believed in the message":

> I followed up with our supervisor/recruiter in NOLA who said that he didn't tell people to wear the shirts (tho[ugh] he didn't tell them not to either). Just happened because the supporters loved the shirts and were passionate about the cause. For what it's worth, apparently many of them have been wearing those shirts everywhere because they were comfy shirts and because they believed in the message.

### 37.

On March 5, 2018, Entergy emailed Hawthorn to relay another payment allegation that was being circulated in an email by some opponents of the NOPS project. Hawthorn simply responded: "Interesting."

### 38.

Not satisfied with that reply, Entergy pressed Hawthorn for a more thorough response to the allegation. Hawthorn responded unequivocally: "Entergy did not pay anyone for their support."

### 39.

The following day, in response to a request from a blog writer seeking comment on payment allegations, which Entergy immediately forwarded to Hawthorn, Hawthorn again dismissed the allegation: "Hired as an actor? Apparently their evidence is one person who is dilusional [sic] or just lying."

### 40.

Unbeknownst to Entergy, Hawthorn had an ongoing relationship with a firm located in California called Crowds on Demand.

**41.**

Entergy discovered for the first time in May 2018 that Hawthorn had subcontracted Crowds on Demand to work on the NOPS project without Entergy's "prior written approval," which was a clear violation of Section 27 of the Agreement, and that Crowds on Demand had paid people to appear in support of NOPS at the October 16, 2017 public meeting and the February 21, 2018 Utility Committee Meeting. Hawthorn acted intentionally, grossly deviated from the applicable standard of care of similar professionals, and acted in bad faith.

**42.**

Hawthorn's subcontracting of Crowds on Demand, and Crowds on Demand's payments to individuals to appear at the October 16, 2017 public meeting and the February 21, 2018 Utility Committee Meeting, were not "in conformance with the highest standards of care and practice appropriate to the nature of the Work" and did not meet "the highest degree of thoroughness, competence and care that is customary in the utility industry" as required by the Agreement.

**43.**

Upon learning that Hawthorn had engaged an unauthorized subcontractor, Entergy demanded that Hawthorn produce all communications generated in connection with Hawthorn's work on the NOPS project.

**44.**

The emails and other documents produced by Hawthorn showed that Hawthorn was in almost constant contact with Crowds on Demand throughout the NOPS project. The emails and other documents also showed that Hawthorn actively concealed Crowds on Demand's involvement from Entergy and routinely forwarded Entergy emails to Crowds on Demand without

Entergy's knowledge.

45.

Throughout this time, Hawthorn maintained the charade that it had engaged in legitimate community outreach activities and had not paid anyone to attend a City Council meeting in support of the NOPS project. Following publication of an article in *The Lens* on May 4, 2018, which contained a link to credible information substantiating the payment allegations, Entergy's General Counsel confronted Hawthorn's Chairman of the Board, who confessed that Hawthorn had retained Crowds on Demand without Entergy's knowledge to work on the NOPS project in violation of the Agreement. He also admitted that Hawthorn had not requested, and had not received, authority from anyone at Entergy to pay supporters to appear at either the October 16, 2017 public meeting or the February 21, 2018 Utility Committee Meeting. A complete copy of Hawthorn's confession, which is excerpted below, is attached as Exhibit A:

> Hawthorn did not inform anyone at Entergy that Hawthorn had engaged Crowds on Demand as a vendor to work on the project, and Entergy did not authorize the engagement of Crowds on Demand.

> Hawthorn's order to Crowds on Demand was to provide supporters who would understand and be able to communicate their support for the proposed new power plant in New Orleans East. Hawthorn did not authorize Crowds on Demand to make any payments to participants, and Entergy did not authorize or direct any payments to participants recruited by Crowds on Demand.

> At no time did Hawthorn inform anyone at Entergy that Crowds on Demand was retained on this project, and Hawthorn neither sought nor received authorization from anyone at Entergy for Crowds on Demand to make any payments to supporters.

46.

Pursuant to Section 27 of the Agreement, Hawthorn is responsible for the work performed by Crowds on Demand to the same extent it is responsible for activities performed by its own

12

employees.

**47.**

Hawthorn's actions damaged Entergy.

**48.**

In May 2018, the City Council adopted Motion M-18-196 initiating an investigation into allegations that Entergy paid or participated in paying actors to attend and/or speak at one or more public meetings in connection with Entergy's NOPS application.

**49.**

On October 29, 2018, the City Council's investigators submitted their Independent External Investigation to the City Council.

**50.**

After spending hundreds of thousands of dollars, interviewing almost two dozen witnesses, and reviewing more than 9,000 pages of documents, the City Council's investigators did not produce any evidence substantiating the allegation that anyone at Entergy "knew" that Hawthorn or its unauthorized subcontractor, Crowds on Demand, had paid people to appear in support of NOPS at either the October 16, 2017 or February 21, 2018 meetings before the City Council.

**51.**

On October 31, 2018, at the conclusion of the City Council's investigation, the Council issued Resolution No. R-18-474.

**52.**

Hawthorn is contractually and legally obligated to reimburse Entergy for the costs associated with the Council's investigation.

**53.**

Pursuant to Section 56 of the Agreement, Hawthorn is also obligated to reimburse Entergy for all costs, attorneys' fees and any other reasonable expenses incurred in connection with these legal proceedings.

**54.**

Entergy has satisfied all conditions precedent to bringing the instant suit.

**55.**

Entergy requests the following relief:

1.      A judgment declaring and adjudicating that Hawthorn breached the Agreement when it and/or its unauthorized subcontractor, Crowds on Demand, without Entergy's knowledge or approval, paid people to appear and/or speak in support of the NOPS project at either the October 16, 2017 public meeting or the February 21, 2018 Utility Committee Meeting;

2.      A judgment declaring and adjudicating that Hawthorn's work, including the work of the unauthorized subcontractor for which it is contractually and legal responsible, failed to meet the highest degree of thoroughness, competence, and care that is customary in the utility industry and was not in compliance with accepted standards for the industry;

3.      A judgment ordering Hawthorn to indemnify and reimburse Entergy for all costs associated with the Council's investigation; and

4.      An award equal to Entergy's attorney's fees, costs, and other expenses incurred in this proceeding.

WHEREFORE, Entergy New Orleans, LLC prays that this Complaint be deemed good and sufficient and that, after due proceedings, there be judgment rendered in its favor, and against The Hawthorn Group, L.C., as requested above. Entergy further prays for all general and equitable relief as the nature of this case may permit.

Respectfully submitted,

/s/ Thomas M. Flanagan
Thomas M. Flanagan (#19569)
Andy Dupre (#32437)
Camille E. Gauthier (#34558)
FLANAGAN PARTNERS LLP
201 St. Charles Avenue, Suite 2405
New Orleans, LA  70170
Telephone: (504) 569-0235
tflanagan@flanaganpartners.com
adupre@flanaganpartners.com
cgauthier@flanaganpartners.com

Attorneys for Entergy New Orleans, LLC